## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **THEODORE PERTILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00832** |
| | ) | **Judge Aleta A. Trauger** |
| **CITY OF MURFREESBORO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Plaintiff Theodore Pertiller has filed suit against defendant City of Murfreesboro, Tennessee ("City"), asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Now before the court is the City's Motion for Summary Judgment (Doc. No. 15), seeking judgment in its favor on all claims asserted in the Complaint (Doc. No. 1). For the reasons set forth herein, the defendant's motion will be granted.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Background

Pertiller filed suit in this court in September 2019, asserting claims of race discrimination and retaliation under Title VII. Following the completion of discovery, the City filed its Motion for Summary Judgment (Doc. No. 15), supporting Memorandum of Law (Doc. No. 16), Statement of Undisputed Material Facts (Doc. No. 17), and numerous deposition excerpts and exhibits. The plaintiff filed a Response in Opposition (Doc. No. 18), Response to the Statement of Undisputed Material Facts (Doc. No. 19), the Declaration of Theodore Pertiller (Doc. No. 19-1), the plaintiff's own deposition excerpts, and a separate Statement of Additional Material Facts (Doc. No. 20). The defendant filed a Reply (Doc. No. 21), a Response to the plaintiff's Statement of Additional

Material Facts (Doc. No. 22), and yet more deposition excerpts. In response to the court's directive and to facilitate the court's review of the record, the parties subsequently filed complete deposition transcripts for the nine most-cited depositions. Because nearly all the facts asserted in the parties' Statements are, at least to some extent, disputed, the facts set forth herein are drawn largely from the deposition transcripts and attached exhibits. The facts are undisputed unless otherwise indicated.

Plaintiff Theodore Pertiller is an African-American man who was employed by the Murfreesboro Fire and Rescue Department ("MFRD" or "Fire Department") for approximately twenty-nine years, beginning in 1990. He was promoted to the rank of captain in 1999. (Doc. No. 1 ¶¶ 5, 6; Doc. No. 24-7, Pertiller Dep. 11, 13.) The chain of command above the rank of captain includes battalion chief, assistant chief, deputy chief, and chief. (*Id.* at 29.) Mark Foulks became MFRD Fire Chief in August 2015 and was chief at all times relevant to this lawsuit. (Doc. No. 24-4, Foulks Dep. 6, 10.) At a disciplinary hearing conducted in June 2019, Foulks forced Pertiller to choose between retirement or termination. Pertiller chose to resign in order to protect his retirement benefits. (Doc. No. 1. ¶¶ 36–39.) For purposes of the defendant's Motion for Summary Judgment, there is no dispute that Pertiller was subjected to a constructive discharge.[1] (*Id.* ¶ 42; Doc. No. 16, at 11 n.4.)

As a captain in the Fire Department, Pertiller directly supervised and was responsible for the two firefighters and the fire engine driver assigned to his engine ("Engine 5"). (Pertiller Dep.

---

[1] "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004)). Title VII treats the employee's resignation under such circumstances as equivalent to "an actual discharge." *Id.* at 1776–77.

29–30, 148.) As captain, Pertiller was also responsible for ensuring that his company acknowledged and responded to emergency calls received from dispatch. (Foulks Dep. 39.)

Calls from dispatch may come through radios inside fire engines, base radios at the fire stations, and also through walkie-talkies carried on a person. (*See* Doc. No. 16-2, at 44.) The ranking employee—*i.e.*, the captain—on each engine is required to have his walkie-talkie on and with his person at all times or, when at the station, to be within hearing distance of the base radio, until 8:00 p.m. (*Id.*) The designated or lead firefighter on each engine is also required to have a walkie-talkie. (*Id.*) According to the plaintiff, calls from dispatch do not always go through correctly. (*See, e.g.*, Doc. No. 24-8, Thomas Dep. 86–87; Foulks Dep. 40–41.)

### B. Implementation of the AVL

It is undisputed that, prior to 2017, emergency response units were assigned to emergency calls according to district or territory lines. Beginning in early 2017, the MFRD began using an automated vehicle location ("AVL") system, which uses GPS to identify and recommend to the dispatcher the closest appropriate emergency response unit to an incident. (Foulks Dep. 45–46; Doc. No. 24-5, Jernigan Dep. 20.) However, although the AVL system was implemented in 2017, the Fire Department did not begin actually using it to assign and dispatch units for response until August 2018, when it began relying on the AVL recommendations. (Jernigan Dep. 34–35.) From early 2017 until August 2018, the Fire Department "manipulated" the AVL system so that it continued to recommend which unit should be dispatched to an emergency based on district "territories," rather than strictly by GPS location. (Jernigan Dep. 34.) Historically, if a company was not assigned to an incident but believed it should have been, it might "jump" a call by telling dispatch it would respond instead of the dispatched unit. (Jernigan Dep. 35.) Once the AVL system was fully implemented, MFRD employees were expressly instructed not to do this anymore and to "let the AVL do its job," unless they were "100% certain that [their] unit is closest." (Doc. No.

20-2, at 59; Jernigan Dep. 35–36; Foulks Dep. 52.) Foulks clarified: "That doesn't mean in every single circumstance [a unit should not jump a call,] because if you're . . . out of service, the AVL doesn't know you're there . . . . And so if you know that you're closer based on, 'Hey this doesn't even know we're here, and I know we're closer than that unit,' it doesn't preclude you from being able to do that." (Foulks Dep. at 52.)

Each of the MFRD's fire engines is equipped with a mobile data terminal, or MDT, which is basically a "laptop computer that sits directly in front of the captain." (Foulks Dep. 43.) It is a "device that's connected directly to the [computer-aided dispatch or "CAD"] system at 911" that provides to the captain of the engine "information related to" 911 calls. (Foulks Dep. 42, 44.) According to Foulks, if the captain is in front of the MDT, he can

> see the call come into the pending queue or a queue that they're getting ready to get dispatched. . . , as well as they can see the call when it is dispatched. They can [communicate to dispatch] that they're en route to the call or change their designation.
>
> They can put "on scene" from that mobile data terminal, as well as see comments related to the call. And everything . . . that the dispatcher has information-wise, they can see that being fed through their CAD system on there.

(Foulks Dep. 42–43.) The MDT in each engine is "the point where the [AVL] comes through to give 911 the closest unit to the call, for purposes of knowing which vehicle to dispatch." (Foulks Dep. 43.) The AVL system generates a recommendation to the dispatcher as to which unit to dispatch to a call based on the closest available unit to that particular call. (Foulks Dep. 45.)

Foulks testified that the captain is not required to monitor the MDT. (*See* Foulks Dep. 43 ("I mean, as far as being required to sit there and watch the MDT for a call to pop up, no.").) Instead, he is required to monitor the radio for calls and to use the MDT for additional information related to the calls. (*See* Foulks Dep. at 53–54 ("Q. Okay. So you're required to monitor the radio?

A. Yes. Q. And then if the radio alerts you to the MDT, you would check the MDT; is that fair? A. Yes.").)

Various witnesses testified that the Fire Department received some training and a user guide for the AVL in December 2016 and January 2017, before the system went "live." (*See, e.g.*, Foulks Dep. 45; Jernigan Dep. 27; Doc. No. 24-9, Toombs Dep. 69; *see also* Doc. No. 16-11, at 1 (Nov. 30, 2016 email from J. Flynt to "MFRD A Shift" re: "MFRD Mobile Training" and attaching MFRD Mobile User Guide); Doc. No. 16-11, at 3 (Jan. 15, 2017 email from J. Flynt to "MFRD All Personnel," attaching updated MFRD Mobile User Guide); Doc. No. 16-11, at 11–38 (Vision Mobile User Guide for MFRD Version 1.1.17).)

Pertiller does not dispute that user guides were sent out via email in 2017 and 2018 and that, as a captain, he was on the distribution list for those emails, but he attempts to dispute whether actual training was conducted, pointing out that there is no written record of any such training, despite the Fire Department's normal practice of maintaining training records. (*See* Jernigan Dep. 27–28; Toombs Dep. 87.) He also asserts that, when the department actually began using AVL response recommendations to generate dispatch recommendations in August 2018, the plaintiff and Battalion Chief Daryl Alexander, the plaintiff's direct supervisor at the time and, thus, the person charged with ensuring that the plaintiff knew how to use the system, were not on speaking terms.[2] (*See* Doc. No. 24-1, Alexander Dep. 90 ("[M]e and him don't talk. . . . Because of our history."); Pertiller Dep. 99; *see also* Thomas Dep. 20 (testifying that he expected his battalion

---

[2] Battalion Chief Daryl Alexander was Pertiller's direct supervisor from 2009 to 2015 and from early 2018 until January 2019. (Doc. No. 24-1, Alexander Dep. 12–14.) Bigelow described a battalion chief's responsibilities to his captains as being there to "support them" in whatever ways they needed support. (Doc. No. 24-2, Bigelow Dep. 15.) He felt that it was important for a battalion chief to be available to his captains and for them to be able to come to him with questions. (Bigelow Dep. 16.)

chief to notify him of policy or practice changes within the department).) Battalion Chief Jamie Bigelow, who was a captain at the time the AVL system was implemented, testified that he did not recall any training: "It's just 'Hey, we're being dispatched by GPS, or AVL.'" (Doc. No. 24-2, Bigelow Dep. 25–26.) Bigelow also did not recall receiving a user guide when the AVL system was implemented (*id.* at 26), even though the record clearly establishes that user guides were distributed.

Captains are responsible for designating their engines as being "in service" or "out of service" on the MDT. (Jernigan Dep. 26.) If an engine is designated "out of service," the AVL cannot "see" it, and the unit will not be dispatched. (Foulks Dep. 52.) Prior to use of the AVL system, an engine was to be designated as "out of service" when it was outside of its assigned territory and back "in service" when it returned to its territory. (*See* Toombs Dep. 72 ("Probably years ago, yes, before—because, [before AVL], we wouldn't know whether [an engine] was in the territory or not, on the old, old system."); Doc. No. 24-6, Leonard Dep. 40 ("And how we used to do it is, . . . we do not go back in service until we get to the edge of our territory . . . .").)

The plaintiff claims that, according to the City's written records, this did not change when the AVL system was added—the formal policy was that an engine should be designated as "in service" only when it is in its own territory. (Pl.'s Resp. Stmt. Undisp. Fact, , Doc. No. 19 ¶ 65 (citing Foulks Dep. Ex. 4, Doc. No. 20-2, at 59).) The exhibit the plaintiff cites, a memo issued by John Flynt on July 25, 2018, does not support his assertion. Flynt's memo notified the Fire Department captains that it was "extremely important" that each unit be designated "in service" when in territory and at base; otherwise, a unit may not be recommended for a call when it otherwise should be. (Doc. No. 20-2, at 59.) The memo does not specifically address whether an engine should be designated "in service" immediately upon leaving training, but it does state that

the system would recommend a unit or units for response based on which were closest to the call and, critically, that "all district boundaries will be dissolved when it comes to incident response." (Doc. No. 20-2, at 59.) In other words, the closest unit would be the one dispatched, irrespective of territory. The City agrees that there is no specific written policy stating that engines are to be designated "in service" upon leaving training. (Jernigan Dep. 120.) Instead, according to Jernigan, "that's just something that you're trained and showed [sic] as you come up through the ranks." (Jernigan Dep. 120–21.)

Captain Terrence Thomas testified that he does not remember an official written departmental policy regarding whether a captain was supposed to put his engine back "in service" upon leaving an out-of-territory training, but he does recall a captains' meeting with Chief Foulks in which Foulks made it clear to the captains that they "better make sure that [they] go in service when [they] leave training and to not take [themselves] out of service unless [they] have a good reason for it, even if [they're] out of territory." (Thomas Dep. 109.) Thomas did not remember when this meeting took place or whether Pertiller was at that particular meeting. (*Id.* at 110.) He also noted that, in the past, prior to implementation of the AVL system, the rule was that if an engine left its territory for any reason, it would be taken out of service and then put back in service when it returned to its district. As Thomas explained, "we would even get on the radio and do that. We would say, you know, '7 is back in territory' or 'back in service' or something like that, back in the day." (Thomas Dep. 109.) Pertiller testified that the "whole time" he had been at the MFRD, "whenever you leave your station you go out of service" and return to service only when back in territory. (Pertiller Dep. 135–36.)

### C. The "August 2018 Incident"

On August 17, 2018, at 10:28 a.m., Pertiller was testing fire hydrants (which is a "loud" process (Leonard Dep. 12)), when dispatch attempted to contact his unit to send it to respond to a

medical call. (Pertiller Dep. 84.) According to the plaintiff, he and at least one of his firefighters had their walkie-talkies on them, but the call did not come through, so they did not answer or acknowledge the call. (Pertiller Dep. 84; Leonard Dep. 13.) Pertiller later learned that he had "gotten in and out of the engine several times" before he noticed the call on the MDT. (Pertiller Dep. 84.) Dispatch only attempted to contact them once and did not dispatch any other unit to respond to the call. (Foulks Dep, 132; Jernigan Dep. 62.) However, an ambulance was dispatched to the same incident and responded. (Jernigan Dep. 62–63.) When he and his crew saw the call on the MDT, approximately thirty minutes later, Pertiller called dispatch but was told to disregard it, as the ambulance was already on site and loading the patient. (Pertiller Dep. 84; Doc. No. 16-4, at 62.)

City Handbook § 3002 sets the disciplinary procedures and grounds for the City's discipline of employees. (Foulks Dep. 12–13; Doc. No. 16-4, at 40–52 (City Handbook § 3002).) After becoming Fire Chief, Chief Foulks adopted a "clean slate" policy of disregarding disciplinary actions that had taken place prior to 2016. (Foulks Dep. 197, 199.) Battalion chiefs typically handle discipline for captains under their command. (Foulks Dep. 14.) However, if the discipline involves anything more serious than a written reprimand, then it is sent up the chain of command for approval. (Foulks Dep. 14–15.) The Chief makes the final call on discipline above the level of a written reprimand, except that anything above a two-day suspension has to be approved by the City Manager. (Foulks Dep. 20.) When any proposed disciplinary action is sent up the chain of command, the next ranking officer can choose to accept, increase, or decrease the recommended action. (Foulks Dep. 18.)

The plaintiff's supervisor, Battalion Chief Alexander, sent a Memorandum to Assistant Chief Kaye Jernigan almost two months later, on October 10, 2018, recommending that Pertiller

be disciplined for missing the call on August 17, 2018. (Doc. No. 16-4, at 58.) Based on Pertiller's having received written reprimands for two missed calls in 2012, Alexander recommended that Pertiller receive a twenty-four-hour shift suspension without pay and be placed on twelve months of disciplinary probation for violation of City Employee Handbook §§ 3002(i)(1) and 3003(b), pertaining to "unsatisfactory job performance" and "inattentiveness to duty." (*Id.*) Jernigan and Deputy Chief Roger Toombs agreed with the recommendation (*see* Doc. No. 16-4, at 59, 60), but Foulks made the decision to issue a written reprimand instead (Foulks Dep. 134–35). According to Foulks, a written reprimand was consistent with the discipline other captains had received for a first offense of missing a call. (Foulks Dep. 135.) And, although Foulks thought that there was a question about whether the plaintiff had actually heard the call, he believed that the plaintiff should have noticed the call on the MDT sooner than he did. (*See id.* (noting that it took Pertiller "over 20 minutes with the call on the MDT" in front of him to notice the call).)

Alexander drafted a Memorandum to Pertiller dated December 6, 2018, informing him that he was receiving a written reprimand for missing the call on August 17, 2018. (Doc. No. 16-4, at 61.) Alexander did not actually give the Memorandum to Pertiller until January 2, 2019. (Alexander Dep. 73.)[3] The Memorandum included a notice of what action Pertiller could take to seek review of the disciplinary action. (Doc. No. 16-4, at 61.)

### D. Pertiller's Discrimination Complaint and Request for Review of Discipline

On January 3, 2019, consistent with that notice, Pertiller sent an email to City Manager Craig Tindall and Human Resources ("HR") Director Pam Russell requesting a review of the written reprimand and, in addition, making a complaint of race discrimination against Alexander.

---

[3] After issuing the reprimand, Alexander was no longer Pertiller's direct supervisor. (Alexander Dep. 11–12.)

(Doc. No. 16-2, at 51.) Aside from his claim that Alexander's decision to issue a written reprimand was motivated by racial bias, the plaintiff complained about an incident that had occurred in November 2018, when Alexander altered the plaintiff's time sheet to remove overtime that the plaintiff had signed up for and worked, replacing it with a "duty exchange" day, without discussing it with the plaintiff or even notifying him that he had done so. (*Id.*) Based on the timing of events, the plaintiff believed that Alexander had initiated the discipline related to the August 2018 incident after the plaintiff went around him to have his time sheet corrected. (Pertiller Dep. 100–01.)

Chris Clausi, then Assistant HR Director for the City of Murfreesboro, was tasked with investigating the plaintiff's discrimination complaint, while Craig Tindall, as City Manager, was responsible for reviewing the written reprimand for the August 17, 2018 incident. (Doc. No. 24-3, Clausi Dep. 9, 15–16, 40.) As part of his investigation, Clausi interviewed Terrence Thomas, who is also an African American captain with MFRD. Thomas reported to Clausi his experiences with Alexander and his belief that Alexander is "harder on African American employees in the department than Caucasian employees." (Doc. No. 20-2, at 80–81.)

Clausi determined in the course of his investigation that Pertiller had missed a call on August 17 and that this constituted a clear policy violation. (Clausi Dep. 59.) However, Clausi also concluded that his investigation raised "concerns that race may have been a factor in the decisions made by Daryl Alexander." (Doc. No. 20-2, at 85; Clausi Dep. 35.) Clausi clarified that he was not sure whether race had played a role, but he found that "too many things there . . . just are unexplainable." (*Id.*) In the course of his HR career, this was the only time he had reached a conclusion that discrimination may have occurred. (Clausi Dep. 36.)

One of the factors Clausi considered was the excessive delay between the actual incident, the disciplinary decision, and the delivery of the written reprimand to the plaintiff. (*See* Clausi

Dep. 35; Doc. No. 20-2, at 85 (Feb. 6, 2019 Clausi Report of Investigation) ("There is also no justifiable reason why the written reprimand wasn't issued to Pertiller until almost five months after the violation has been committed."); *see also* Doc. No. 20-2, at 77 (April 29, 2019 Memo from Foulks to Tindall, acknowledging that he and Jernigan had counseled Alexander regarding the delay of discipline); Toombs Dep. 42 (noting that he would "hope" that the disciplinary process would usually take less than two months); Alexander Dep. 19 (acknowledging that it normally takes "[a]bout a month" for a disciplinary recommendation to make its way up the chain of command).)[4] Clausi also found that there was no reasonable explanation for Alexander's alteration of the plaintiff's time card. (Doc. No. 20-2, at 85.) Clausi also determined that Alexander had disproportionately disciplined Black captains in the five years prior to Pertiller's complaint—of the four captains he had disciplined during that time frame, three were Black. (Doc. No. 20-2, at 85.)[5]

Craig Tindall reviewed the record pertaining to the written reprimand and upheld the discipline as appropriate. More specifically, he concluded that Pertiller's "neglect of [his] duty was a serious offense and no mitigating circumstances were present at the time." (Doc. No. 16-5, Tindall Dep. 20, 37; *see also* Doc. No. 20-2, at 78 (March 6, 2019 Memo from Tindall to Foulks,

---

[4] The City attempts to dispute that the delay is excessive, but its citations to the record only support the fact that Clausi (like the plaintiff) was unaware that Alexander had initiated the disciplinary recommendation in October 2018, before the issue concerning Alexander's alteration of the plaintiff's time card arose in November 2018. (Clausi Dep. 56–57.)

[5] In following up on Clausi's Report, however, Foulks determined upon review of Alexander's actions dating back to 2015 that Alexander had administered eleven disciplinary actions to captains under his command:

Four of the actions were counseling sessions, seven were reprimands to nine different Captains (two Captains received two actions). Of the nine Captains two were African American and seven are Caucasian, the two Captains that received multiple actions were both Caucasian.

(Doc. No. 20-2, at 77.)

finding that the written reprimand was appropriate based on Pertiller's actions but also acknowledging the discrimination complaint and directing Foulks to investigate the reasons for the delay in discipline and to consider whether Alexander needed diversity training).) Pertiller received a short memo from Tindall stating that he agreed with the written reprimand, but Pertiller did not receive a copy of Clausi's actual report until after he filed this lawsuit. (Pertiller Dep. 121–22; *see also* Doc. No. 20-2, at 78.)

Sometime between March 6 and April 29, 2019, Toombs told Foulks that Pertiller filed a meritless complaint every time he was disciplined. (Foulks Dep. 116–17, 201; Toombs Dep. 52–53.) Toombs also told Foulks that none of Pertiller's complaints had ever been substantiated, but Foulks did not look into the complaints independently. (Foulks Dep. 116–17, 239.)

### E.    The "May 2019 Incident" and Ensuing Discipline

On May 29, 2019, Pertiller's engine (Engine 5) and several others participated in a scheduled training at the training grounds within the City, outside of the plaintiff's designated territory. (Pertiller Dep. 132–33, 135–36; Bigelow Dep. 29.) As per protocol, Pertiller's engine was designated as "out of service" during the training. (Bigelow Dep. 44–45.) Foulks testified that, when the training ended, based on their AVL status on the CAD, every engine other than the plaintiff's was placed back in service before leaving the training grounds. (Foulks Dep. 179.) Pertiller's engine remained out-of-service while Pertiller and his company left the training ground and went to a nearby restaurant, still outside their territory, located at 1720 Old Fort Parkway in Murfreesboro, to pick up food. There was "nothing wrong" with their stopping at the restaurant. (Bigelow Dep. 29.) While Pertiller's company was waiting for food to be prepared, a medical 911 call came in from a location on Old Fort Parkway. (Pertiller Dep. 133.) Because his engine was still designated "out of service," Pertiller was not actively monitoring his radio during this time. (Pertiller Dep. 133.) In addition, because Pertiller's engine was not designated as in service, it was

not dispatched to the call. However, when the call came through on his walkie-talkie, Pertiller heard the street name, "Old Fort Parkway." (Pertiller Dep. 133.) He did not "pay much attention to it" because he knew his engine was still out of service, and he also figured that the call could have come from anywhere on Old Fort Parkway. (Pertiller Dep. 153.) However, he did not contact dispatch to confirm the exact location of the emergency. (Pertiller Dep. 153.) If his engine had been designated as in service, the AVL system would have "picked [him] up" and likely would have recommended that his engine, being the closest, be dispatched to respond to the call. (Pertiller Dep. 153.) Pertiller's driver, Kevin Leonard, did not designate their engine as back in service until 6:19 p.m., two hours after the engine was back at the station. (Pertiller Dep. 149–50; Doc. No. 16-2, at 52.)

Engine 1, which was in service, was dispatched to the call, which came from 1714 Old Fort Parkway, Miller's Ale House. (Bigelow Dep. 41; Doc. No. 16-4, at 66.) When Engine 1 arrived at the incident, it was waved away by an ambulance that was already on the scene. (*See* Foulks Dep. 144–45.) However, the captain on Engine 1 called Captain Keith, the training captain, to report seeing Engine 5 in the parking lot adjacent to Miller's Ale House but that Engine 5 did not respond to the call. (Bigelow Dep. 41–42; Doc. No. 16-4, at 66.) After being informed of this incident by Keith, Battalion Chief Bigelow went to Station 5 to interview those involved. (Doc. No. 16-4, at 66–68.) Bigelow told Pertiller what had been reported to him. Pertiller told Bigelow that he had heard that the location of the call was Old Fort Parkway but that Engine 5 was designated out of service at the time. (Doc. No. 16-4, at 66.) Bigelow told him that he wanted "all [his] Captains to always be ready to take a call, and to get on the radio to say 'we're close, we'll take that call' even if the MDT has out of service on the status." (Doc. No. 16-4, at 66.) Bigelow also informed Pertiller that the matter was "a big deal, . . . a major infraction." (Bigelow Dep. 33–34.) Pertiller told him

that missing the call was not intentional. (Doc. No. 16-4, at 73.) Bigelow did not believe that the plaintiff intentionally ignored the call, but he did consider it to be a third missed call. (Bigelow Dep. 46.) According to the plaintiff, no one ever instructed him to place his engine back in service immediately after finishing training. His understanding was that he was to stay out of service until he was back in his territory. (Pertiller Dep. 144.)

On June 4, 2019, after completing his investigation into the incident, Bigelow drafted a summary of his investigation and recommended to Assistant Chief Jernigan that Pertiller receive a total of two twenty-four-hour shift suspensions without pay and be placed on twelve months of disciplinary probation, based on his having missed calls in March 2012 and August 2018. (Doc. No. 16-4, at 73.)

Also on June 4, 2019, Jernigan drafted a Memorandum to Deputy Chief Toombs, agreeing in part with Bigelow's proposed discipline but recommending to Toombs that the plaintiff be suspended for five shifts without pay, rather than two, and that he be demoted two ranks, to firefighter. (Doc. No. 16-4, at 74.) Jernigan was aware of three other instances in her career when an employee was demoted two levels, none of which had occurred within the past ten years. (Jernigan Dep. 39–40.) She knew that this demotion might cause Pertiller to resign. (Jernigan Dep. 139.)

Continuing up the chain of command, Toombs noted in his June 6, 2019 Memorandum to Chief Foulks that he concurred with Jernigan's recommendation. (Doc. No. 16-4, at 75.) Toombs had gotten involved in the investigation even before receiving Jernigan's recommendation, by emailing John Flynt to request information about the location of Engine 5 throughout the day of the incident. (Toombs Dep. 105.) Toombs testified that this was not the only time he has gotten

involved in an investigation, but he was unable to recall, when asked, other investigations in which he had gotten involved on the front end. (Toombs Dep. 105–06.)

On June 19, 2019, Chief Foulks conducted a pre-disciplinary meeting with the plaintiff to discuss the proposed discipline. Foulks always conducted such a meeting any time someone was going to be "suspended or demoted or anything of that nature, . . . to give them their chance to provide their side of the story." (Jernigan Dep. 135–36.) Foulks recalled that he discussed the recommended discipline with Jernigan and Toombs prior to the meeting. (Foulks Dep. 181.) He believed they also discussed the fact that, if the recommendation went up the chain to the City Manager, Tindall might step it up from a demotion to a termination. (Foulks Dep. 183–84.) Both Foulks and Jernigan were concerned about the effect a termination would have on Pertiller's retirement benefit. (Foulks Dep. 184–85.) He believes he discussed with Toombs the dollar amount that might be implicated by a termination. (Foulks dep. 185–86.)

Foulks, Pertiller, Jernigan, Bigelow, Leonard, and Assistant City Attorney Kelley Baker attended the pre-disciplinary meeting. (Foulks Dep. 155, 190.) Jernigan was there to present the facts of the case and her disciplinary recommendation, and Pertiller told his side of the story and responded to questions from Foulks. (Foulks Dep. 190.) According to Foulks, during this conversation, Pertiller stated that responding to the call was "not his responsibility, that that was not his territory, and that's the responsibility of whoever's territory that they're in." (Foulks Dep. 192; *see also* Jernigan Dep. 141.) This statement was what "turned [Foulks] away from doing a demotion and toward doing a termination." (Foulks Dep. 192.) Foulks told Pertiller that responding to the call was his responsibility and that doing so was what a "prudent person [who] wanted to take care of this community" would have done. (Foulks Dep. 192–93.) And at that point, Foulks told Pertiller that he was not going to accept Jernigan's recommendation and instead would

recommend termination to the City Manager or, alternatively, give Pertiller the opportunity to retire, so that he would not have to wait ten years before being able to draw his retirement, which would mean losing up to $400,000 in retirement benefits. (Foulks Dep. 191; Jernigan Dep. 141.) Foulks told Pertiller that the City Manager was aware of the incident and knew that the pre-disciplinary meeting was taking place. Foulks thought the City Manager would agree with whatever disciplinary recommendation resulted from the pre-disciplinary meeting. (Foulks Dep. 205–06.) In his deposition, Foulks specifically denied that he had talked to the City Manager about terminating Pertiller and denied telling Pertiller that the City Manager would agree with termination. (Foulks Dep. 206.) He offered Pertiller the weekend to think about the choice, but Pertiller responded immediately that he would elect to retire and that he was sorry and "just didn't know." (Foulks Dep. 193.) Foulks denies losing his temper or yelling at the plaintiff during the meeting. (Foulks Dep. 206–07; *see also* Bigelow Dep. 54; Leonard Dep. 29–30; Jernigan Dep. 142.)

Kevin Leonard attended the meeting to provide support for Pertiller, to indicate that he did not agree with the proposed discipline, that he believed that Pertiller was a good captain, that they did not ignore a call, and that Pertiller would never have intentionally violated policy. (Leonard Dep. 25, 27, 33.) He recalled that there was a discussion about training on the MDT and ATV system and a difference of opinion as to whether Pertiller had received any actual training on it. (*Id.*)

According to Pertiller's account of the meeting, Foulks asked him about how they trained on the MDT, and Pertiller told him that the captains basically "talked among [them]selves and . . . trained each other," but they never had any formal training courses. (Pertiller Dep 172.) Pertiller believed that it was this statement that "triggered" Foulks to suddenly become upset and to begin

yelling, degrading and "talk[ing] down" to Pertiller. (*Id.*) According to Pertiller, Foulks at this point stated that he was going to "up the ante," threatened to take away $400,000 in retirement benefits if the plaintiff did not resign, and told him the City Manager had already "approved" Foulks' decision to terminate him if he did not resign. (Pertiller Dep. 170–71.) In his deposition, Pertiller confirmed that he did not admit to "missing a call" because, as he said, "I wasn't dispatched. How can you miss a call if you're not dispatched?" (Pertiller Dep. 172.) He now denies stating that the call was not his responsibility, but the citations he offers in support of that statement do not actually support it. (*See* Pertiller Dep. 172–73 (denying that he missed a call or that he would "intentionally do anything that's going to harm" anyone); Bigelow Dep. 46 (stating that he did not believe that Pertiller would let something like this happen again or that he intentionally ignored a dispatch).)

In evaluating the discipline for the May 2019 incident, Foulks considered the August 2018 incident, but he did not review Pertiller's personnel file or take any other previous discipline into account. (Foulks Dep. 198–200.) Jernigan, however, acknowledged that she had worked with Pertiller for a long time and that disciplinary incidents predating Foulks' tenure were "in the back of [her] mind." (Jernigan Dep. 76–78.) Toombs, in agreeing with Jernigan's recommended discipline, also considered Pertiller's entire personnel file and disciplinary history, which he viewed as displaying a "pattern" of missing calls. (Toombs Dep. 80–82.) In recommending termination, Foulks stated that he took into consideration the fact that the plaintiff had heard the street name on the call but had chosen not to ask dispatch about the location. (Foulks Dep. 207.) He testified that the biggest factor in his mind was the plaintiff's "lack of taking responsibility for his job . . . . He's a captain in the fire department that can affect the actions of an entire company within our department. And he basically stated that it was not his responsibility to answer a call

that he knew about happening . . . ; it was somebody else's." (Foulks Dep. 207–08.) Even Leonard, who did not believe that Pertiller should have been demoted or terminated, agreed that the engine should have gone back in service when they left the training ground and that, if he, as acting captain, had heard the street name "Old Fort Parkway" on the call, he would have checked into where on Old Fort the call came from. (Leonard Dep. 36–37, 40.)

According to Terrence Thomas, Chief Foulks later announced in a captains' meeting that Pertiller's employment ended because he "lied about some things." (Thomas Dep. 100.)

The plaintiff asserts that the record shows that the appropriate discipline for a second or even third missed-call offense is one twenty-four-hour suspension and twelve months of disciplinary probation. (*See* Toombs Dep. 31–32, 42-44; Alexander Dep. 28–29, 67; Bigelow Dep. 46; *see also* Doc. No. 16-4, at 73 (Bigelow's summary of investigation, recommending two twenty-four hour suspensions and twelve months of disciplinary probation for what he considered to be a third missed-call offense).) The City denies that the Fire Department has a standard or baseline measure of discipline for a second or third offense, because no other captain has missed multiple calls.

### F.     The Plaintiff's Proposed Comparators

In attempting to identify other employees outside his protected class who were treated more favorably than he was after engaging in comparable conduct, the plaintiff equates missed calls and delayed response to calls, and he asserts that the City views missing a call and a delayed response to a call as the same for disciplinary purposes. (Pl.'s Stmt. Add'l Mat'l Facts, Doc. No. 22 ¶ 92 (citing Foulks Dep. Ex. 6, Doc. No. 16-4, at 55–57).) The referenced exhibit documents an incident that took place in February 2012, when Captain Brian Lowe received a written reprimand for a delayed acknowledgment of a call, due to his not taking his radio with him into the restroom. (Doc. No. 16-4, at 56–57.) Foulks was not chief at the time, and the exhibit does not indicate the length

of the delay or whether it resulted in Lowe's unit's arriving late to the scene of the call or other adverse consequences.

Moreover, Foulks testified that, under his supervision, which began in 2015, the MFRD has "benchmarks" or goals for responding to calls, including a goal time of "60 seconds or less" from receipt of the dispatch call to being en route, and a goal of "80 seconds from the 911 call to en route" in the case of fire calls. (Foulks Dep. 101, 103; *see id.* at 102 ("And that's what we strive for, is 60 seconds out-of-the-chute time, 90 percent of the time, on a 90th percentile basis."); *see also* Jernigan Dep. 19 (identifying goal of a minute to be out the door for a medical call and "a minute and a half to two minutes" for fire calls.) In both cases, the goal is that the responding unit arrive at the call within four minutes of being en route. (Foulks Dep. 104; Jernigan Dep. 19.) If multiple units are called, the other units should be at the call within nine minutes. (Jernigan Dep. 19.) These are "just some of the benchmarks. They are goals. . . . [T]hey are not in general orders." (Foulks Dep. 104.)

Typically, if dispatch does not receive an acknowledgment of a dispatch within a minute, it "is going to start inquiring" as to what is going on. (*Id.*) However, "[i]f a fire department employee misses these time benchmarks," he is not subject to investigation or discipline unless the delay is markedly long. (Foulks Dep. 105; *see id.* at 105–06 ("[I]f we have a four-minute out-of-the-chute time or . . . even a three-minute out-of-the-chute time, then that's going to be looked at and potentially disciplined because that's . . . almost missing the call. But it just depends on the circumstances.").)

In his written discovery responses, the plaintiff identified three white captains who have missed or failed to respond to a service call but were not terminated: Karl Daigle, Kernie Cothran, and Clay Walls. (Doc. No. 16-12, at 2.) Daigle was issued a written reprimand by Battalion Chief

Lowe for a first offense of missing a call in November 2018. (Doc. No. 16-12, at 2.) The plaintiff alleges that Cothran missed or failed to answer a call in June 2019 and that Walls failed to timely respond to a call in August 2019 (incident number 0012049), without being terminated, but he provides no additional information about either incident. (Doc. No. 16-12, at 2.). The City's records reflect that Cothran has never been disciplined for any missed calls during his tenure. (Pl.'s Resp. Stmt. Undisp. Fact, Doc. No. 19 ¶ 70.)

The plaintiff points to Clay Walls as a comparator whose unit was untimely in responding to a call but who was not disciplined. According to the incident report for a call on August 10, 2019, Station 7 received a call at 18:07:32, was en route at 18:08:19, and arrived on scene at 18:11:16. (Doc. No. 16-1, at 7.) Walls was the captain of Engine 4, which was designated as the second responding unit after Engine 7. (*Id.* at 8.) Unit 4 was dispatched at 18:07:32, en route by 18:11:01, and arrived on scene at 18:15:05. (*Id.*) The City asserts that Engine 4 arrived at the call scene within nine minutes, within the benchmark for a second unit's response time. The plaintiff asserts that, although Engine 4 arrived within the City's benchmark time, it did not "respond" within the benchmark time of sixty seconds, and it took nearly four minutes to go en route. Walls was not subject to discipline based on this incident. (Toombs Dep. 117.)

Pertiller also points to an incident that took place on April 12, 2020, when four white captains missed the time benchmarks for being en route to a fire. (Toombs Dep. 114–17; Doc. No. 20-9, at 31–40.) According to the incident report for this call, the first responding unit, under Captain Lee Douglas, was dispatched at 5:39:04, was en route at 5:42:08, and arrived at 5:45:30, a total response time of 6:26. (Doc. No. 20-9, at 35.) The second unit, engine R-4, under Captain Gary Hutchinson, had a total response time of 7:14, from dispatch at 5:39:04 to en route time of 5:42:32, to arrival time of 5:46:18. (Doc. No. 20-9, at 35–36.) The third responding unit, Apparatus

L-8, had a response time of 9:44, taking over two minutes from dispatch to response time and more than seven minutes en route. (Doc. No. 20-9, at 37.) This unit was under Captain Jeff Irvin. (*Id.*) Finally, Apparatus L-1, captained by Brian Creager, had a 6:08 response time, taking more than two minutes to leave the station and an additional four minutes en route. (Doc. No. 20-9, at 37.) These times were, at least to some extent, outside the "benchmarks" identified by Foulks. No discipline was issued in relation to this incident. (Toombs Dep. 117.)

The City asserts that no other captain has missed multiple calls, and the plaintiff disputes this fact on the grounds that the City does not collect or maintain this type of information. In the deposition testimony to which the plaintiff cites, Foulks testified that the City does not regularly keep track of response times or delayed responses to calls—he was not talking about missed calls. (Foulks Dep. 107–08.) Toombs agreed that, if an individual missed a call or responded late to a call but was not disciplined, the City would not maintain a record of the incident. (Toombs Dep. 111–12.)

### G. Racial Demographics in the Fire Department

The City currently employs approximately 235 individuals in the Fire Department, of whom 88.5% are Caucasian and 7.6% are Black. (Doc. No. 20-1.) Foulks agreed that his department is "a little bit less diverse than the community." (Foulks Dep. 85; *see also* Clausi Dep. 12 (acknowledging that the Fire Department "didn't reflect the diversity of the community that they serve").)[6]

Since Foulks became Fire Chief in 2015, the MFRD has hired 108 new employees, of whom eight are Black. (Doc. No. 20-1.) During the same time frame, three Fire Department

---

[6] The parties have provided no evidence of the actual racial makeup of the City of Murfreesboro.

employees have been fired, excluding Pertiller, all of whom are Black. (Foulks Dep. 123.) Since 2016, forty-four individuals have served as captains, of whom four are Black. ((Doc. No. 20-1.) Under Foulks' supervision, twenty-seven individuals have been promoted to captain, none of whom is Black. (*Id.*) The last time a Black employee was promoted to captain was February 2012. Following Pertiller's departure, only two Black captains remained. (*Id.*)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P.

56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## III.     DISCUSSION

### A.     Race Discrimination – Disparate Treatment Claim

#### 1.     *Legal Standards*

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," among other characteristics. 42 U.S.C. § 2000e–2(a)(1). Intentional discrimination claims under Title VII can be proven by direct or circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

If a plaintiff produces direct evidence of discrimination, "the burden shifts [back] to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.* at 415. When a plaintiff uses circumstantial evidence to prove his case, the court analyzes the claim under the familiar three-step *McDonnell Douglas*

framework. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (referencing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "On a motion for summary judgment,

a district court considers whether there is sufficient evidence to create a genuine [factual] dispute

at each stage of the *McDonnell Douglas* inquiry." *Id.* In *Clay*, the Sixth Circuit recognized that,

while there are "many 'context-dependent ways by which plaintiffs may establish a *prima facie*

case'" of race discrimination, the "key question is always whether, under the particular facts and

context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered

an adverse employment action under circumstances which give rise to an inference of unlawful

discrimination." *Id.* (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir.

2007)).

The first stage of the *McDonnell Douglas* analysis requires the plaintiff to establish a *prima*

*facie* case of discrimination, usually by proving: "(1) membership in [a] protected class; (2) that

he or she suffered from an adverse action; (3) that he or she was qualified for the position; and (4)

that he or she was treated differently from similarly situated members of the unprotected class."

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (citation omitted). If the

plaintiff demonstrates a *prima facie* case of discrimination, the burden shifts to the employer to offer

a legitimate, nondiscriminatory explanation for its actions. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400

(6th Cir. 2009).[7] If the defendant does so, the burden shifts back to the plaintiff to show that the

defendant's proffered reason is pretextual, which can be done by showing that it "(1) has no basis

---

[7] In *Chen*, the Sixth Circuit acknowledged then-recent criticism of its three-part test and emphasized that the test should not be applied formalistically, "lest one lose the forest for the trees." *Chen*, 580 F.3d at 400 n.4. Courts should engage in a commonsense inquiry: "did the employer [take the adverse action] for the stated reason or not? . . . One can distill the inquiry into a number of component parts, . . . [b]ut that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Clay*, 501 F.3d at 704 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)).

> 2.     *The Parties' Arguments*

The defendant asserts that the plaintiff has no direct evidence of discrimination and cannot prove a *prima facie* case using circumstantial evidence, because he cannot identify a similarly situated comparator for purposes of proving the fourth element—that he was treated less favorably than similarly situated non-protected employees. Alternatively, it argues that, even if he can establish a *prima facie* case, the plaintiff cannot show pretext.

In response, the plaintiff asserts, first, that he has direct evidence of discrimination, because the City "admits that race may have been a factor in BC Alexander's actions in 2018." (Doc. No. 18, at 10.) And, he contends, the City cannot show that it would not have made the decision to force him to retire "absent its impermissible response," because "[w]ithout the discriminatory 2018 matter, Captain Pertiller would not have been forced to retire." (*Id.* at 11.)

Alternatively, Pertiller argues that, while identifying a comparator in this case was difficult because of the City's record-keeping practices, the evidence nonetheless establishes that White employees were treated better than he was. He also argues that "additional evidence" of "racial animus" permits him to establish a *prima facie* case under the particular factual circumstances of this case, pointing to (1) demographic evidence that, he claims, "shows that [the City] prefers white people" when it comes to hiring (Doc. No. 18, at 14); and (2) evidence that race discrimination may have played a part in the disciplinary action related to the August 2018 incident. With regard to the latter, Pertiller specifically invokes the "cat's paw" theory of employer liability. Finally, he

argues that a jury question exists as to whether the City's proffered reason for forcing him to retire was prextextual.

### 3. *The Plaintiff Has No Direct Evidence of Discrimination*

Direct evidence is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010) (citation omitted). Direct evidence "proves the existence of a fact without requiring any inferences." *Grizzell v. City of Columbus*, 461 F.3d 711, 719 (6th Cir. 2006) (quotation marks and citation omitted). That is, direct evidence, *per se*, establishes "not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *DiCarlo*, 358 F.3d at 415 (quoting *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000)).

The only "direct evidence" to which the plaintiff points is Chris Clausi's conclusion that "race may have been a factor in the decisions made by Daryl Alexander"—specifically, Alexander's decision to discipline the plaintiff in connection with the August 2018 incident and his alteration of the plaintiff's time card in November 2018. (Doc. No. 20-2, at 85; Clausi Dep. 35.)

Clausi's conclusion does not constitute direct evidence of race discrimination, for at least two reasons. First, Clausi's conclusion itself required an inference—that is, it was not based on direct evidence. (*See* Doc. No. 20-2, at 85 ("There is no specific evidence that supports race being a factor in Alexander's decision to discipline Pertiller.").) As Clausi himself recognized in his deposition, by using the word "may," Clausi did not mean to "imply that [race discrimination] did or that it didn't" occur. (Clausi Dep. 35.) He thought discrimination was a possibility based on "too many things there that just are unexplainable." (*Id.*) His conclusion was not based on a finding that Alexander had actually made racially charged comments or expressed a discriminatory

animus. Thus, Clausi's conclusion that Alexander's decision "may" have been influenced by race discrimination is not an "admission" on the part of the City that the plaintiff was actually subjected to race discrimination and does not constitute direct evidence of race discrimination.

Second, as the court will address in greater detail in connection with the "cat's paw" theory of liability, below, even if Alexander's conduct toward him did constitute direct evidence of discrimination, the plaintiff's lawsuit is not based on his receipt of the written reprimand from Alexander; it is based solely on his constructive discharge in June 2019.[8] Alexander himself had no involvement in the plaintiff's constructive discharge or the proceedings leading up to it. Thus, even if Alexander himself had acted with discriminatory intent, that intent would not necessarily be imputed to Chief Foulks, who ultimately made the adverse employment decision that is the subject of this lawsuit. *Accord Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) ("[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's [adverse employment action] do not constitute direct evidence of discrimination."); *Boges v. Gen. Motors Co.*, 808 F. Supp. 2d 1043, 1048 (M.D. Tenn. 2011) (Trauger, J.) ("Wilcox was not a decision maker with regard to the plaintiff's discipline, and, therefore, his statements cannot constitute direct evidence of discrimination.").

       4.      *Cat's Paw Theory*

The plaintiff briefly alludes to a "cat's paw" theory of liability, without making much effort to explain how it would apply in this case. (*See* Doc. No. 18, at 14 ("BC Alexander's biased action

---

[8] It is unlikely that the written reprimand the plaintiff received in connection with the August 2018 incident was sufficiently "adverse" to give rise to a Title VII discrimination claim. *See Creggett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012) ("A written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." (citations omitted)).

was a causal factor in Captain Pertiller's discharge, which demonstrates that Chief Foulks served as a conduit, or the cat's paw, of BC Alexander's prejudice." (citing *Chattman*, 686 F.3d at 352)).) The court's explanation of why the theory does not apply here will require substantially more ink than the plaintiff's claim that it does.

The Supreme Court explained the application of a "cat's paw" theory of liability in 2011 in the context of a case alleging discrimination in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). The plaintiff there presented direct evidence of his immediate supervisors' bias against him arising from his military obligations as a member of the United States Army Reserve, but his immediate supervisors were not responsible for his termination. Rather, the decision to terminate him was made by a Vice President of Human Resources, Buck. In making the termination decision, however, Buck relied on the fact that the plaintiff's direct supervisors had given him a Corrective Action disciplinary warning a few months previously, allegedly based on a fabricated violation of a fabricated company policy, and then accused him, allegedly also falsely, of violating the Corrective Action plan. When the plaintiff pursued the company's grievance procedures to challenge his termination and informed Buck that he believed that his termination was motivated by hostility toward his military obligation, Buck did not investigate his allegations but adhered to her original decision based on a conversation with another personnel employee and her review of the plaintiff's personnel file. The Seventh Circuit reversed a jury verdict for the plaintiff, finding, as a matter of law, that the employer could not be liable unless "the nondecisionmaker exercised

such 'singular influence' over the decisionmaker that the decision to terminate was the product of 'blind reliance.'" *Id.* at 416 (internal quotation marks and citations omitted).

The Supreme Court disagreed, holding: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *Id.* at 422 (emphasis in original). Relying on ordinary principles of agency and tort law, the court concluded that, "if the employer's investigation results in an adverse action for reasons *unrelated to the supervisor's original biased action . . . , then the employer will not be liable*." *Id.* at 421 (emphasis added). However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account *without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified*." *Id.* (emphasis added).

The Sixth Circuit applied this theory in *Chattman*, a Title VII race discrimination case. There, the plaintiff produced direct evidence of "discriminatory intent" on the part of his immediate supervisor, but the immediate supervisor's racial animosity did not, *per se*, establish the defendant employer's liability, because the biased supervisor was not the decisionmaker with regard to the adverse employment action. Thus, in order to impute liability to the employer, the court had to employ the cat's paw theory of liability addressed in *Staub*. Under this theory, the plaintiff was required to—and did—show that the direct supervisor "intended . . . to cause an adverse employment action" and that his discriminatory action was "a proximate cause of the ultimate employment action." *Chattman*, 686 F.3d at 351.

The cat's paw theory of liability does not apply in the case at bar, however. The plaintiff's theory is that his written reprimand arising from the August 2018 incident was racially motivated and that, if he had not already had this initial disciplinary action on his record at the time of the

June 2019 incident, the missed call in June 2019 would have been a first offense and, as such, would not have been sufficient to trigger his termination. The first problem with this theory is that the plaintiff's complaint of racial discrimination associated with the written reprimand was thoroughly investigated, and even Clausi, who believed that Alexander might harbor racial bias, concluded that the undisputed evidence supported a finding that the plaintiff had clearly violated policy by missing a call. (Clausi Dep. 59.) The City Manager, after reviewing Clausi's exhaustive report of his investigation into the plaintiff's discrimination complaint, determined that the written reprimand was appropriate and warranted, regardless of whatever subjective bias Alexander may have harbored. (Doc. No. 20-2, at 78.)

Even prior to that, before the plaintiff made a complaint of discrimination, Mark Foulks had reviewed the discipline recommended for the incident and concluded that a written reprimand was appropriate for the missed call. After receiving Pertiller's complaint of discrimination, he also reviewed Alexander's history of administering discipline going back to 2015 and found that he had administered eleven disciplinary actions to captains under his command during that time to nine different captains (two of whom had received two actions). Of the nine captains, two were Black and seven were not, and the two captains who received two actions each were Caucasian. (Doc. No. 20-2, at 77.)

In other words, this situation is facially similar to *Staub*, insofar as the plaintiff alleges that a prior disciplinary action by a biased supervisor led to his termination, because the second offense would not have been considered serious enough to warrant termination if the prior offense were not already on his record. But it is very different from *Staub*, because his "employer's investigation result[ed] in an adverse action for reasons unrelated to [Alexander's] original biased action," as a result of which there is no basis for imputing liability to the City based on the written reprimand.

*Staub*, 562 U.S. at 421. That is, Alexander's "biased report" did not "remain a causal factor," because "the independent investigations" into the plaintiff's actions and his discrimination complaint "determin[ed] that the [written reprimand] was, apart from the supervisor's recommendation, entirely justified." *Id.* Thus, the plaintiff cannot establish that bias on the part of Alexander was a proximate cause of the June 2019 disciplinary action. In sum, even assuming that the plaintiff could show that Alexander intended to cause an adverse employment action,[9] the cat's paw theory of liability does not apply.

### 5. The Plaintiff's Case Based on Indirect Evidence

Alternatively, the plaintiff asserts that he can prove discrimination using circumstantial evidence. There is no dispute that he satisfies the first three elements of his *prima facie* case, at least for purposes of the Motion for Summary Judgment: (1) as a Black man he is a member of a protected class; (2) his being forced to choose between retirement and termination constituted a constructive discharge and, thus, an adverse employment action; and (3) he was qualified for the position of Captain at the Fire Department. The parties dispute only whether he was treated differently from similarly situated members of the unprotected class.

In *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992), the Sixth Circuit identified three factors that are relevant to determining whether employees are "similarly situated" in the context of cases alleging differential disciplinary action:

> [T]o be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have [1] dealt with the same supervisor, [2] have been subject to the same standards and [3] have engaged in the same conduct

---

[9] Arguably, because Alexander initially recommended suspension without pay and disciplinary probation, he "intended" to impose discipline that would have qualified as an adverse employment action, for purposes of the first step in *Staub*, even if there is no direct evidence that he was motivated by racial bias.

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* at 583. Although "the weight to be given to each [*Mitchell*] factor can vary depending upon the particular case," *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003), the Sixth Circuit has also noted that these factors "generally are all relevant considerations in cases alleging differential disciplinary action." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The Sixth Circuit has also explained that the plaintiff is not required to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'; rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

With regard to the third factor, courts are instructed to focus on whether the plaintiff and his comparators engaged in conduct of "comparable seriousness," not whether their actions were identical. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Mitchell*, 964 F.3d at 583). "[A] plaintiff cannot establish a reasonable inference of discriminatory motive based on her 'employer's more severe treatment of more egregious circumstances.'" *Id.* (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002)); *see also Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 483 (6th Cir. 2008) ("[T]o be considered the 'same conduct,' it must be similar in kind and severity." (citing *Clayton*, 281 F.3d at 611)).

The plaintiff claims that he is similarly situated to several White captains who, he claims, "responded" late to emergency calls but were not disciplined.[10] His argument that he is similarly

---

[10] He also maintains that these individuals were all subject to the same ultimate decisionmakers (Jernigan, Toombs, and Foulks), even if their direct supervisors varied. The defendant does not respond to his argument, and the court presumes, for purposes of the Motion

situated to these individuals is premised upon his contention that "[t]he City views missing a call and a delayed response to a call as the same for disciplinary purposes." (Doc. No. 18, at 11 (citing Foulks Dep. Ex. 6, Doc. No. 16-4, at 56).) In response, the City disputes whether it considers missing a call and responding late to a call as comparable in seriousness and maintains that the plaintiff has failed to identify any similarly situated comparators who were treated more favorably than he was for the same or truly comparable conduct. The question is whether the plaintiff has shown that his proposed comparators "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 584.

The only evidence to which the plaintiff points in support of his claim that the City views a missed dispatch and a delayed response to a dispatch as the same, for disciplinary purposes, is a written reprimand issued to Captain Brian Lowe in March 2012, under a directive from then-Chief Gaines. Lowe did not miss a call—he was simply delayed in answering a dispatch for several minutes, because he was in the bathroom when the dispatch came in, had not taken his walkie-talkie into the bathroom with him, and did not hear it or the base radio, causing his crew (who did hear the dispatch) to have to come search for him. (*See* Doc. No. 16-4, at 56, 57; Alexander Dep. 24–25.) The written reprimand issued to him specifies that he was being disciplined based on violation of the rule requiring that the "ranking employee on each engine . . . have their walkie-talkie on at all times OR . . . be in hearing distance of the base radio" and that, by not having his walkie-talkie on him, Lowe failed in his "responsibility to acknowledge Dispatch on [a] call[] pertaining to [his] engine company." (Doc. No. 16-4, at 56.) In other words, he was not disciplined

for Summary Judgment, that the "same supervisor" factor is either met or deserving of little weight under the circumstances presented here.

for delay, *per se*, but for failure to have his walkie-talkie on his person and failing to verbally acknowledge the dispatch in a timely fashion. If this single incident, occurring seven years prior to the plaintiff's constructive discharge under a different Fire Chief, were sufficient to establish a "policy" of any kind, it supports the existence of a policy requiring captains to be able to hear dispatches at all times and to verbally acknowledge any dispatch of his company in a timely fashion.

In attempting to identify comparators, however, the plaintiff uses the term "response" to refer, not only to a verbal acknowledgment of a dispatch, but also to a company's physical reaction to a dispatch by leaving the fire station and arriving at the scene of the emergency. He points to incidents that occurred in 2019 and 2020, when five different White captains failed to meet the benchmark times referenced by Foulks in his deposition for being "en route" after being dispatched to a scene and for actually arriving at a scene. Specifically, in August 2019, Captain Clay Walls took almost four minutes from the time of dispatch to being en route for a medical emergency, well outside the one-minute benchmark identified by Foulks, but, as the second unit dispatched, he actually arrived at the scene within Foulks' benchmark. On April 12, 2020, four different White captains took from two to more than three minutes from dispatch time to being en route for a fire call, again outside the eighty-second benchmark identified by Foulks, and the first responding unit arrived at the fire outside the four-minute benchmark identified by Foulks. The evidence to which the plaintiff points, however, says nothing about whether each individual captain verbally acknowledged the dispatch in a timely fashion or whether any of them violated the rule that he

either have his walkie-talkie on his person or be within hearing distance of the base radio. (*See* Doc. No. 16-4, at 56.)

In sum, there is simply no evidence in the record that the Fire Department regarded a two- or three-minute delay in departure after being dispatched as equivalent to missing a call altogether, or even as equivalent to failing to answer or acknowledge a dispatch in a timely fashion. The plaintiff's attempt to compare himself to the five captains who took more than two or three minutes to be en route to a call after being dispatched is, therefore, misplaced. Because these individuals did not engage in the same *kind* of conduct, they are not similarly situated. Moreover, even if several minutes of delay in leaving the station on call were comparable to missing a call altogether, the plaintiff has not pointed to any other individual who missed two calls within a twelve-month period. Thus, the conduct of the purported comparators was not similar in *severity*. *Barry*, 276 F. App'x at 483.

Seeking to avoid dismissal of his claims based on his failure to identify similarly situated individuals who were treated more favorably than he, the plaintiff argues that other evidence in the record satisfies his requirement of establishing a *prima facie* case of discrimination, including that the City "admits" that it disciplines a disproportionate number of Black employees compared to White employees and that the Fire Department's demographics and actions show that it prefers to hire and retain White people, which qualifies as "further evidence of racial animus." (Doc. No. 18, at 13–14.) The plaintiff's attempt to use demographics to support his claim is unavailing. Although the defendant concedes that the percentage of Black employees at the Fire Department is less than that of the community it serves (*see* Foulks Dep. 85 ("I believe we're a little bit less diverse than the community.")), the plaintiff has not presented any evidence regarding the City's racial makeup or how many Black candidates have applied for jobs with the Fire Department.

Consequently, the number of employees, by itself, says nothing about the Fire Department's hiring practices. *See Hawkins v. Memphis Light, Gas & Water*, 520 F. App'x 316, 322 (6th Cir. 2013) ("Without evidence of the racial composition of the pool of qualified candidates, a reasonable factfinder would be unable to determine whether bias motivated [the defendant's] decisions, or if the decisions were based on legitimate selection criteria or chance."). As for the number of Black employees who have been fired, the plaintiff offers no evidence regarding the circumstances of those terminations. In order to conclude that they have any bearing on the plaintiff's case, the court would, at a minimum, need to consider whether any of those individuals was fired under circumstances that might give rise to an inference of racial discrimination. The plaintiff offers no such evidence.

Because the plaintiff is unable to show that a material factual dispute exists as to whether he was treated differently from similarly situated non-protected employees or to present some other comparable evidence based on which an inference of racial discrimination might arise, the defendant is entitled to summary judgment in its favor on the Title VII discrimination claim.

### B. Retaliation

The plaintiff argues, first, that he has direct evidence of retaliation. He points to evidence that, at some point after he had been notified by City Manager Tindall of the discrimination complaint against Alexander, Foulks discussed the complaint with Toombs, who told Foulks that Pertiller "essentially had filed a complaint every time that he had been disciplined throughout his career." (Foulks Dep. 116; *see also* Toombs Dep. 52.) The mere fact that Foulks was aware that the plaintiff had made previous discrimination claims when Foulks made the disciplinary

determination in June 2019, standing alone, is not direct evidence of a retaliatory motive, as it requires an inference.

To establish a *prima facie* case of retaliation under Title VII using circumstantial evidence instead, a plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted); *see also Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory reason for its actions. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). As with a discrimination claim, if the defendant articulates such a legitimate, non-discriminatory reason, the plaintiff, to avoid summary judgment, must present evidence to show that the defendant's stated reason "is merely a pretext for discrimination." *Id.* (citation omitted).

There is no dispute that the plaintiff's complaint about Alexander constitutes protected activity and that the constructive discharge is a materially adverse action. The issue is whether the plaintiff can establish a causal connection between the two events. The actual protected activity—the lodging of the discrimination complaint against Alexander—took place on January 3, 2019. (*See* Doc. No. 16-2, at 51.) It is unclear when, exactly, Foulks or anyone else within the upper leadership of the Fire Department learned of the complaint, but, based on an email exchange in the record, it clearly happened sometime prior to March 6, 2019. (*See* Doc. No. 20-2, at 78 (March 6, 2019 email from Tindall to Foulks, subject line "Follow-up – Pertiller Investigation," beginning, "As you know, on January 3, 2019, Ted Pertiller sent me an email alleging an adverse action based

on race discrimination due to a reprimand he received from Daryl Alexander issued January 2, 2019.").) The adverse action took place on June 19, 2019, three and a half months later.

In the Sixth Circuit, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Mickey*, 516 F.3d at 525. Thus, for example, when an employee is fired the same day his employer learns of his protected activity, this "acutely" close proximity in time is sufficient to "constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Id.* However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

The Sixth Circuit has recently reaffirmed that "[t]emporal proximity alone generally is not sufficient to establish causation" and that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448–49 (6th Cir. 2020) (quoting *Mickey*, 516 F.3d at 525; other citations omitted). In *Kenney*, the plaintiff was fired two and a half months after complaining about the employer's discriminatory hiring practices. The court held that "[t]hat temporal proximity is one consideration in assessing whether [the plaintiff] has satisfied her burden to show causation between her complaint and her termination. But a roughly 75-day delay between her protected activity and an adverse

employment action is not, standing alone, a convincing case for proving causation." *Id.* at 449. Thus, the plaintiff was required to "provide other indicia to support a causal connection." *Id.*

Based on *Kenney*, the plaintiff here must offer additional evidence, aside from the temporal proximity of at least three and a half months between Foulks' learning about Pertiller's protected activity and the adverse action, to establish a causal connection between these events, for purposes of his *prima facie* case. The plaintiff attempts to do that, arguing that the disciplinary matter was "not handled according to standard practices." (Doc. No. 18, at 16.) Specifically, he argues, Toombs "inserted himself directly" into the investigation of the May 29 incident, which he did not typically do; the investigation and proposed discipline moved up the chain of command with unprecedented rapidity; the penalty—whether the double demotion proposed by Jernigan and Toombs or the termination that Foulks ultimately settled on—was unreasonable and disproportionate to the offense; Foulks was markedly hostile and demeaning toward the plaintiff during the pre-disciplinary hearing, which, the plaintiff implies, conflicted with Foulks' embrace of a "clean slate policy" with respect to the August 2018 incident; and Foulks later informed the other captains, with no justification, that Pertiller had lied. (*See* Doc. No. 18, at 16–17.)

The problem, however, is that none of this other evidence is suggestive of retaliation, principally because the plaintiff has not shown that any other captain had ever missed two calls within a twelve-month period. Even assuming that Toombs' involvement in the investigation was unusual and that the disciplinary process proceeded with greater speed than usual, neither of those factors suggests retaliation. Rather, they suggest that the Fire Department regarded the May 2019 incident as a very serious matter. While there is a factual dispute as to whether Foulks raised his voice or behaved with hostility toward the plaintiff, the plaintiff himself admits that Foulks' behavior changed at some point during the meeting, that he suddenly became upset. The plaintiff

did not know what "triggered" Foulks, but he believed it was the plaintiff's statement that the captains never received training on the MDT. (Pertiller Dep. 172.) Foulks, however, testified that the thing that changed his mind about accepting Jernigan's proposed discipline and instead pivoting toward termination was Pertiller's failure to take responsibility for the May 29 missed call. Although Pertiller disputes actually stating that responding to the call was not his responsibility, he confirmed during his deposition that he did not admit to "missing a call" because, as he said, "I wasn't dispatched. How can you miss a call if you're not dispatched?" (Pertiller Dep. 172.) In other words, he did not take responsibility for missing a call.

The plaintiff also argues that Foulks' markedly different response toward the plaintiff's August 2018 missed call and the June 2019 incident can only be attributable to Foulks' learning about the plaintiff's protected conduct in the meantime. However, the change in the discipline does not imply a retaliatory motive. It is more readily explained by the fact that the plaintiff missed a second call under circumstances that Foulks deemed to be egregious and potentially embarrassing—a fire engine across the parking lot from the source of an emergency call that did not bother to respond (*see* Foulks Dep. 153)—and for which the plaintiff refused to take responsibility. In sum, none of the additional evidence on which the plaintiff relies points toward a retaliatory motive. It points to an unusual situation that warranted an unusual disciplinary response. *Accord Kenney*, 965 F.3d at 449 ("All things considered, there is nothing unusually

suggestive about the timing of Kenney's termination." (internal quotation marks and citation omitted)).

The court finds, therefore, that the plaintiff has not established a *prima facie* case of retaliation.

### C.      Pretext

Even if the plaintiff had established a *prima facie* case of either discrimination or retaliation, he cannot show that the defendant's proffered reason for his constructive discharge was pretextual. Summary judgment on this basis is warranted as well.

The Sixth Circuit has identified "three interrelated ways" of showing pretext: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's decision." *Hostettler v. Coll. of Wooster,* 895 F.3d 844, 858 (6th Cir. 2018) (quoting *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014)). "The three-part test for pretext 'need not be applied rigidly,' but rather 'is a commonsense inquiry.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 811 n.10 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012)). Thus, to successfully oppose summary judgment, the plaintiff must produce sufficient evidence from which a jury could reasonably reject the City's reason for the constructive discharge. *Chen*, 580 F.3d at 400. As the Sixth Circuit has explained:

> The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action. To show an honest belief, the employer must be able to

establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."

*Mickey*, 516 F.3d at 526 (internal quotation marks and citations omitted).

The defendant's proffered reason for the constructive discharge is that the plaintiff missed a call a second time within a twelve-month period and failed to take responsibility for his action; that he missed the call because he had improperly designated his engine as out of service; and that he then chose not to inquire further into a dispatch even though he heard that the address to which a unit was being dispatched was on the same street as he was.

The plaintiff argues that the proffered reason has no basis in fact. He maintains that he had not received training on the AVL and did not know that he was supposed to designate his engine as in service immediately upon leaving training. While there may be a factual dispute as to whether he actually knew that this rule had changed upon the implementation of the AVL system, there is no dispute that Foulks honestly expected him to know this rule based on Foulks' having issued a verbal directive at a meeting with the captains and based on the fact that every other captain who attended the same training as the plaintiff designated his engine as in service upon leaving the training grounds that day. *See Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect."). In addition, Pertiller does not deny that he heard the call on his radio, actually heard the address, and knew it was for an emergency on the same road he was on, but chose not to contact dispatch to obtain additional information. Finally, although he disputes actually stating that responding to the call was not his responsibility, Pertiller confirmed during his deposition that he did not admit to "missing a call" because, as he said, "I wasn't dispatched. How can you miss a call if you're not dispatched?" (Pertiller Dep. 172.) That

is, as set forth above, it is clear that he did not take responsibility for missing the call. The plaintiff's attempt to create a material factual dispute based on whether he used the word "responsibility" is unavailing. The plaintiff has not shown that the proffered reason for his constructive discharge had no basis in fact.

The plaintiff also argues that the proffered reason is insufficient to justify the harsh discipline meted out to him. (*See* Doc. No. 18, at 18 ("Discharge in this situation is like 'swatting a fly with a sledge hammer.'" (quoting *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999)).) He argues that "multiple witnesses" have "admitted" that a second or third missed-call violation warrants a twenty-four-hour suspension and twelve months of probation rather than a double demotion or termination. While it is true that some supervisors (notably Alexander and Bigelow) were of the belief that a second or third missed call warranted suspension and probation, the plaintiff has not pointed to any other captain who had actually missed two calls in a twelve-month period. More specifically, he has not identified any other captains under Chief Foulks who missed two calls in a twelve-month period.

Pertiller also claims that he was discharged for violating policies that were not actually reflected in any written document and that "the conflict between the City's written rules and the stated reason for termination is evidence of pretext and, at a minimum, presents a material factual dispute that cannot be resolved on summary judgment." (Doc. No. 18, at 18–19.) However, the evidence to which he points does not establish the existence of a conflict. At most, there was some ambiguity as to how the policy in effect after implementation of the AVL should be interpreted, but there is no dispute that everyone other than the plaintiff interpreted it to mean that a unit should be in service upon leaving the training center, that district boundaries were "dissolved when it comes to incident response," that, through the AVL system, the unit closest to a call would be the

one dispatched, irrespective of territory, and that "jumping" a call was appropriate if a captain was "100% certain [his] unit was the closest." (Doc. No. 20-2, at 59.)

The plaintiff claims that he has provided "numerous examples of other individuals who have missed calls that were actually intended for them yet were not disciplined in any manner" and that this discrepancy is evidence of pretext. (Doc. No. 18, at 19.) However, as discussed above, the other individuals whom he identifies did not miss calls or fail to acknowledge a dispatch. Rather, they failed to meet benchmark goals for the length of time between receiving a dispatch and leaving the station or arriving at the scene. The plaintiff also has not pointed to any individual who repeatedly missed such benchmarks by wide margins.

Finally, the plaintiff argues that the "highly irregular disciplinary process is evidence of pretext." (Doc. No. 18, at 19.) For this argument, he points to the excessively lengthy time between the August 2018 incident and the written reprimand—for which Alexander received counseling from Jernigan and Foulks (*see* Doc. No. 20-2, at 77)—in contrast to the "hastily completed" process associated with the May 2019 incident (Doc. No. 18, at 19). The evidence he offers in support of the "irregularity" of the June 2019 proceeding is the same as that offered in support of his claim of other evidence of a causal connection between his protected conduct and protected activity. In this context, too, the evidence simply does not imply a nefarious motive. Rather, it is suggestive of the seriousness of the incident.

The plaintiff also argues that the proffered reason did not actually motivate the City's conduct and that the City, instead, was motivated by a desire to get rid of Black employees. "To succeed here, [the plaintiff] must provide evidence '[that] tend[s] to prove that an illegal motivation was more likely than that offered by the defendant.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020) (quoting *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 9 (6th

Cir. 2007)). Although it is troubling that Foulks has apparently supervised the termination of a disproportionate number of Black employees, the plaintiff has no competent evidence to support his assertion that the City was motivated by a desire to get rid of Black employees.[11] The plaintiff has not created a material factual dispute as to pretext.

## IV.    CONCLUSION

For the reasons forth herein, the defendant's Motion for Summary Judgment will be granted. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge

---

[11] The Sixth Circuit has indicated that, for a plaintiff to argue that his conduct did not actually motivate the adverse action, the plaintiff "necessarily concedes the factual bases of the company's decision." *Brown*, 814 F. App'x at 82 n.10 (citing *Chattman*, 686 F.3d at 349, as stating that arguing under the second category requires "admit[ting] the factual basis underlying the employer's proffered explanation and further admit[ting] that such conduct could motivate dismissal[]"). The court presumes that the plaintiff can nonetheless argue pretext under this category in the alternative: assuming for purposes of the motion for summary judgment that the defendant's proffered reason is based in fact and offering evidence showing that it was actually motivated by something else.